Filed 11/20/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAWN LOFTON et al., <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO HOME MORTGAGE, <br><br> Defendant; <br><br><br> DAVID MARK MAXON, <br><br> Movant and Respondent; <br><br><br> INITIATIVE LEGAL GROUP, APC, <br><br> Objector and Appellant. | A136626 <br><br> (City and County of San Francisco <br> Super. Ct. No. CGC -12-523966) <br><br><br><br> ORDER MODIFYING OPINION <br> AND DENYING REHEARING; <br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 22, 2014, be modified as follows:

1. On page 1, the first three sentences of the first paragraph are deleted and the following sentences are inserted in their place:

> This case was brought on behalf of home mortgage consultants working for Wells Fargo Home Mortgage (Wells Fargo) seeking damages for unpaid wages.  It is related to class action litigation initiated by attorneys Kevin McInerney and James Clapp (class counsel) in 2005.  In 2006 and 2007, appellant Initiative Legal Group, APC, (ILG) filed similar putative class actions in different superior courts. Thereafter, additional actions were filed by both class counsel and ILG, culminating in the filing by class counsel of the present action to facilitate the request for approval of a class action settlement.

2. On page 2, the first full paragraph, beginning with "In many respects" is modified to read:

1

In many respects, that did not happen with these cases. The litigation proceeded on different tracks. A class was certified then decertified in the action filed by class counsel and ultimately, the actions filed by ILG were broken up into several different lawsuits asserting identical individual claims on behalf of 600 plaintiffs.

3. On page 3, the last full paragraph is modified to read:

In 2005, attorneys Kevin McInerney and James Clapp (class counsel) initiated class action litigation against Wells Fargo seeking damages for wage claims on behalf of thousands of home mortgage consultants who had allegedly been misclassified as exempt employees. In 2006 and 2007, ILG filed putative class actions alleging similar claims on behalf of similar classes. Although a class was initially certified in the 2005 case, that class was decertified in 2010. Once it became clear that the cases would not be proceeding as class actions, ILG filed multiple lawsuits, each with 30 to 90 plaintiffs, on behalf of its 600 clients, including Maxon.

4. On page 4, in the first full paragraph, at the end of the sentence ending with "(hereafter the class action or *Lofton* settlement)" add as footnote 1 the following footnote, which will require the renumbering of all subsequent footnotes:

[1]The terms "class action" or "*Lofton* settlement" refer collectively to the related wage-claim actions filed by class counsel dating back to 2005.

The petition for rehearing is denied. There is no change in the judgment.


Date: _____ P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAWN LOFTON et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>WELLS FARGO HOME MORTGAGE,<br><br>　　　Defendant;<br><br><br>DAVID MARK MAXON,<br><br>　　　Intervener and Respondent;<br><br><br>INITIATIVE LEGAL GROUP, APC,<br><br>　　　Objector and Appellant. | A136626<br><br>(City and County of San Francisco<br>Super. Ct. No. CGC -12-523966) |

     This case was brought on behalf of home mortgage consultants working for Wells Fargo Home Mortgage (Wells Fargo) seeking damages for unpaid wages. It was filed by class counsel in 2005. In 2006, Appellant Initiative Legal Group, APC, (ILG) filed a similar action in the Los Angeles Superior Court. The initiation of similar claims by different lawyers on behalf of the same or a similarly described class is neither novel nor rare. (See generally *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819; *In re Vitamin Cases* (2003) 110 Cal.App.4th 1041.) A customary course for such multiple actions is coordination or effectively the consolidation of the proceedings before the first court to acquire jurisdiction over the dispute under the doctrine of concurrent exclusive jurisdiction. (*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising* (2000) 85 Cal.App.4th 1168, 1175.)

In many respects, that did not happen with these cases. The litigation proceeded on different tracks. In the San Francisco case discovery proceeded apace. In the Los Angeles case, a class that was originally certified was decertified in 2010, and the case was broken up into several different lawsuits asserting identical individual claims on behalf of 600 plaintiffs.

But in one critical respect, the actions were joined as a practical matter. They were coordinated for mediation of a settlement, and agreements to resolve all claims were reached before the same mediator on the same day. A common fund was agreed upon to resolve the class action and a separate common fund was agreed upon to resolve the many individual actions filed on behalf of ILG's clients. At the preliminary approval hearing for the class action settlement, the court was told that ILG's clients would opt out of the class action. Moreover, ILG informed the trial judge who presided over the class action that ILG was concerned that if the class settlement were approved, its clients would in effect become represented by class counsel and ILG would be unable to communicate directly with them about the class action case.

This theoretical difficulty was worked out at the hearing. But contrary to the explanation of the settlement that had been provided to the court, ILG assisted its class member clients in securing the benefits of the class action settlement rather than in opting out of the class and thereby seek recompense from the $6 million common fund ILG had obtained. The question thus arises as to what was the import of the common fund settlement obtained by ILG if its clients participated in the class settlement?

According to ILG, the settlement was for its attorney fees for services ILG performed on the aborted class action and the 600 individual cases. ILG explained to its clients that while it "thought" the $6 million it obtained in settlement represented attorney fees, it was willing to pay from the settlement $750 to each plaintiff for a claim it said was arguably not resolved in the class action. ILG later increased the amount payable to its clients to $1,750 after intervenor David Maxon objected to ILG's final proposed allocation of the settlement proceeds. Of course, this proposal would still leave ILG with approximately $4,950,000 of the $6 million settlement as attorneys fees. It is manifest

2

that ILG intended to effectuate distribution of the almost $5 million in fees to itself without court approval. Such a move by lawyers representing so many plaintiffs in a common fund situation appears to us unprecedented. It is fraught with the potential for conflicts of interest, fraud, collusion and unfairness. (Cf. *Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 552–556.)

The trial court in this class action issued a temporary restraining order requiring ILG to, among other things, deposit into a secure escrow account under the control and supervision of the court the settlement proceeds it contends represent attorney fees for the actions it brought against Wells Fargo on behalf of its approximately 600 former clients, one of whom is intervenor David Maxon. ILG argues that the court lacked jurisdiction to issue the TRO, abused its discretion in issuing the TRO and relied on inadmissible evidence in issuing the TRO.

In this unusual context, we hold that the trial court presiding over the class action properly enjoined ILG from distributing or taking action to distribute the proceeds of its settlement to itself. The court presiding over the class action had concurrent exclusive jurisdiction to consider the propriety of the settlement of class member claims, even for those class members represented by ILG on class or related claims. Moreover, the trial court had a duty to ensure the fees claimed by ILG were reasonable in light of the overall result ILG achieved. The TRO is affirmed.

## Factual and Procedural Background

In 2005, attorneys Kevin McInerney and James Clapp (class counsel) initiated class action litigation against Wells Fargo seeking damages for wage claims on behalf of thousands of home mortgage consultants who had allegedly been misclassified as exempt employees. In 2006, ILG filed a putative class action alleging similar claims on behalf of a similar class. Although a class was initially certified in the ILG case, that class was decertified in 2010. Once it became clear that its case would not be proceeding as a class action, ILG filed multiple lawsuits, each with 30 to 90 plaintiffs, on behalf of its 600 clients, including Maxon.

In February 2011, ILG, Wells Fargo and class counsel engaged in a mediation of all pending claims. In April 2011, class counsel moved for preliminary approval of a proposed settlement class and settlement in the present action (hereafter the class action or *Lofton* settlement). Pursuant to the terms of the agreement, Wells Fargo agreed to pay $19 million, including attorney fees to class counsel, to settle the claims of all members of the settlement class. The settlement class was described in notices as all individuals employed by Wells Fargo at any time from February 10, 2001 through March 26, 2011 as overtime exempt home mortgage consultants. The gross recovery for each class member who submitted a timely claim was projected to be approximately $7,300.

At the preliminary approval hearing in this class action, ILG asked the court for a brief continuance explaining that it represented 600 clients with individual lawsuits against Wells Fargo who "if the court grants the motion [for approval of the class settlement] . . . will suddenly become represented by class counsel and it will be a little bit of a problem for us to communicate with them if they are actually represented." Class counsel opposed the continuance explaining, "These individuals' cases that these gentlemen have been referring to were essentially settled on the very same day in front of the very same mediator . . . . Everything else was worked out. Wells [Fargo] has a separate settlement agreement with these folks. [¶] . . . Indeed, the thought of the settlement was that these gentlemen . . . would have their individual plaintiffs opt out. If they did not, they would be covered by the proposed class settlement." Class counsel agreed, however, that they would not contact anyone that was independently represented by ILG. Judge Loretta Giorgi granted preliminary approval of the class action settlement.

In June 2011, class counsel moved for approval of $6,333,333 in attorney fees and costs. Their moving papers reiterated that during the February 2011 mediation, the parties reached a "settlement for the class of $19,000,000 and a settlement of the individual ILG lawsuits of $6,000,000." A footnote in the briefing informed the court that, "Approximately 600 HMCs filed individual suits using the offices of [ILG]. The settlement negotiated on February 15, 2011 with ILG called for a gross settlement of approximately $6,000,000 or an average gross distribution of $10,000 per individual

4

plaintiff. Wells rationalized this higher figure by the fact that these individuals had been willing to sign a retainer agreement and commence a separate lawsuit. It was contemplated that the ILG clients would recover from the richer per capita fund secured by ILG for its individual clients and opt out of the $19 million class settlement." The memorandum acknowledged, however, that with two weeks remaining in the opt-out period, no class members had opted out.

Class counsel's motion to approve the settlement was filed in July 2011. The moving papers note that of the 8,390 potential class members, approximately 4,000 had submitted claim forms and none had filed objections. None of ILG's 600 clients opted out of the settlement. The average recovery for class members who submitted timely claims was $2,050 after subtraction of fees and expenses. The record does not contain a transcript of the hearing on the motion for final approval but nothing in the briefing suggests that there was any further discussion of the $6 million ILG settlement with the court.

On July 27, 2011, Judge Giorgi issued an order and judgment finally approving the *Lofton* settlement, including an award of $6,333,333 in attorney fees to class counsel. The order granting final approval defined the class, as it was described in the notices to class members, as "All persons who, at any time from February 10, 2011 [sic] up to and including March 26, 2011, are or were employed by Wells Fargo Bank, N.A. as Home Mortgage Consultants . . . in the state of California and classified by Wells as exempt from overtime." The court retained jurisdiction over the implementation and enforcement of the settlement agreement pursuant to Code of Civil Procedure

section 664.6 and California Rules of Court, rule 3.769(h).[1]  The judgment is now final and apparently the settlement funds have been distributed.

In late May 2011 intervenor Maxon, and apparently other individuals represented by ILG, received notice of the proposed class action settlement that advised recipients it was necessary for them to file claims in order to share in the settlement proceeds or alternatively opt out of the settlement class.  On May 16, 2011, Maxon received an e-mail from ILG that stated: "To participate in the settlement, please send the claim form directly to us and not to the administrator.  We want to make sure it is accurate and properly processed."  Thereafter, Maxon received follow-up telephone calls from an ILG attorney instructing him to fill out the claim form and send it to ILG.

In January 2012, six months after the class action settlement was finally approved by the court, ILG updated its clients regarding the litigation with Wells Fargo.  Its letter begins, "As you may know, the class action entitled *Lofton v. Wells Fargo* . . . has been approved by the Court and you should have received your portion of the settlement by now. . . . Since the *Lofton* settlement has been approved, we will formally dismiss the actions we filed for the released wages claims . . . ."  The January 2012 letter further informed its clients for the first time that ILG "thought" it had negotiated an additional settlement of $6 million dollars for the attorney fees and costs incurred by ILG "for work performed on litigation involving Wells Fargo including three class actions, a labor code private attorney general action, and the approximately 600 individual actions . . . that

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise noted and all rules references are to the California Rules of Court. Section 664.6 provides, "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement." Rule 3.769(h) provides "If the court approves the settlement agreement after the final approval hearing, the court must make and enter judgment. The judgment must include a provision for the retention of the court's jurisdiction over the parties to enforce the terms of the judgment. The court may not enter an order dismissing the action at the same time as, or after, entry of judgment."

were resolved by *Lofton*." However, because there was a statutory claim with a maximum penalty of $750 that was "arguably" not resolved in the *Lofton* settlement, ILG proposed that in exchange for a release of this claim, its clients would each receive a $750 payment and the approximately $5,520,000 of remaining settlement funds would be paid to ILG as attorney's fees. After most of the clients signed the release, Wells Fargo authorized the payments and ILG dismissed all the individual lawsuits. Maxon did not sign the release and objected to the allocation of the $6 million dollar settlement.

On August 17, 2012, ILG sent a second letter to each of its 600 clients informing them of Maxon's objections to the allocation of the $6 million settlement. The letter states, "Recently, one of ILG's former clients has disputed the amount of the attorneys' fees and costs paid by Wells Fargo to ILG in connection with the settlement of the litigation against Wells Fargo. The details of the former client's allegations and potential allegations are set forth in the attached disclosure statement. ILG intends to vigorously defend against these charges and does not believe there is or was anything wrong or improper in the settlement allocation or the payment of legal fees and costs, and that the settlement payments and legal fee allocations were fair and reasonable under all relevant circumstances. However, to avoid a potentially protracted dispute with our clients, we are proposing to settle any potential claims you may have by paying you an additional $1000 in exchange for you executing a settlement and release of all claims."

On September 5, 2012, Maxon filed a putative class action against ILG and four of its attorneys asserting claims for breach of fiduciary duty, declaratory relief, and violations of Business and Professions Code section 17200 on behalf of the 600 clients ILG represented in the litigation with Wells Fargo. The complaint alleges that during the course of the February 2011 mediation of the class action claims, "[w]ithout obtaining or even *seeking* their clients consent, [ILG] entered into secret settlement negotiations with Wells Fargo" and "agreed to an unallocated, aggregate $6 million settlement without conveying any settlement offers to clients or securing their authorization to accept or even consider any particular settlement proposal, and agreed to dismiss the clients pending lawsuits without the knowledge or approval of clients." According to the

7

complaint, ILG concealed the existence of its settlement from its clients while urging them to share in the distribution of the pending class settlement. After the *Lofton* settlement was complete and no ILG clients opted out, ILG finally disclosed the existence of the supplemental settlement to its clients. According to the complaint, the January and August letters contained "a series of false and misleading statements" and intended to induce clients to execute the attached releases.

On September 6, 2012, Maxon filed an ex parte application in this case for an order shortening time to hear a motion to intervene along with an application for a TRO.[2] Maxon's application explains that he "seeks to intervene in this action in order to give the court an opportunity to review the subsequent payment of an *additional* $5.5 million in attorneys' fees to *another* group of attorneys, [ILG] in connection with their work on behalf of a subset of about 600 members of the certified class . . . ." The application opines that ILG's conduct is "unlawful because it is well-established that judicial approval is required for all attorneys fees paid in connection with class actions" and that "immediate intervention is critical to ensure that ILG attorneys do not dissipate the millions of dollars they have wrongfully retained." In addition to other things, Maxon sought a TRO compelling ILG "to hold in trust for ILG-client class members" the approximately $5.5 million Wells Fargo paid ILG under the separate settlement. In opposition to Maxon's application, ILG attorney Marc Primo submitted a declaration explaining that although the *Lofton* settlement resolved "the overlapping wage and hour claims brought by ILG clients who did not opt out of the class action, it did not resolve any non-overlapping claims and ILG's substantial fees and costs incurred since 2006 in twelve lawsuits separate and apart from *Lofton*. To that end, Wells Fargo and ILG discussed a potential resolution of ILG's fee claims and any remaining individual claims, which was contingent upon final approval of the *Lofton* class settlement between Wells

---

[2]Maxon's complaint in intervention names Wells Fargo as the defendant and alleges the same causes of action as those alleged in the underlying class action complaint.

8

Fargo and [class counsel.] [¶] . . . While the proposed settlement to ILG and its clients was contingent upon the resolution of *Lofton*, it was not *part* of the *Lofton* settlement."

At the hearing on the TRO, Judge Harold Kahn questioned class counsel regarding why Judge Giorgi was not informed prior to the final approval of the settlement that, contrary to class counsel's expectations, the 600 ILG plaintiffs had not opted out of the settlement. Judge Kahn questioned whether class counsel was concerned "for the class members who were not ILG clients that their $19 million settlement was being diluted" and indicated that he was "very, very troubled" by the situation. The court explained, "I believe that I am obligated to completely take another look at this settlement. What appears to me based on the record is there has been egregious misconduct and bad faith on the part of ILG. And I say that recognizing those are serious words. [¶] I am troubled by what appears to be either turning a blind eye to or participation in that egregious misconduct by class counsel who was paid over $6 million, and a distinguished law firm that represents one of the great banking institutions of this country. [¶] The motion to intervene, though, seeks to intervene to represent just the interests of the ILG clients. And that may be appropriate but I am taking a look at the entire settlement. I believe that there is good cause to think that the entire class, not just the ILG clients, have been badly disserved. There is going to be extensive work on the part of all of us to get to the bottom of this. And if there is, as I believe there will be found, serious misconduct, it will be remedied."

The court granted Maxon's motion to intervene and issued a TRO requiring ILG (1) to deposit into the court or a trust account, and hold subject to the court's control and supervision, all monies ILG collected from the supplemental settlement with Wells Fargo, less funds ILG had paid to its clients; (2) to file a full accounting; (3) to refrain from any further action to "induce" former clients to release claims against ILG or its attorneys; (4) to refrain "from taking any action to enforce the terms of any purported release" signed by former clients; (5) to file and serve a list of names and contact information for former clients; (6) if contacted by former clients, "to state only that these matters are being considered by the Court and that they will receive further information

9

shortly;" and (7) to file with the court a declaration describing steps taken to comply with the TRO.

ILG timely filed a notice of appeal.

## Discussion

### 1. *ILG is not "aggrieved" with respect to the order allowing intervention.*

Prior to filing his brief, Maxon moved to dismiss this appeal insofar as it challenges the court's order granting Maxon's intervention in the class action lawsuit. Maxon argued that that ILG lacks standing to appeal as it is neither a party to the action nor aggrieved by the order. We denied the motion without prejudice to his arguing the issue in his respondent's brief and now grant it on the ground that ILG was not aggrieved by the intervention order. Only "[a] party who has an interest recognized by law that is adversely affected by the judgment or order is an aggrieved party. [Citations.] The interest must be immediate and substantial, and not nominal or remote. [Citations.]" (*Serrano v. Stefan Merli Plastering Co., Inc*. (2008) 162 Cal.App.4th 1014, 1026–1027.) There is no dispute that Maxon's complaint in intervention alleged the same wage claims as were alleged in the underlying class action and named Wells Fargo, not ILG as a defendant. Accordingly, ILG's appeal is dismissed in part.

### 2. *The trial court did not exceed its jurisdiction in issuing the TRO.*

ILG argues that once the final judgment was entered in this class action, the trial court lacked jurisdiction to issue the TRO because the court's reservation of jurisdiction under section 664.6 only authorized enforcement of the terms of the settlement agreement. Moreover, ILG says, even assuming the court retained jurisdiction to exercise supervisory power over the class action, such authority would be limited to the parties and class counsel but would not "extend to attorneys who represent class members other than as class counsel." According to ILG, the court had no authority to issue a TRO against ILG because ILG was not a defendant in the class action. ILG's position grossly understates the authority of the court to supervise proceedings before it in furtherance of justice.

10

"When a court has jurisdiction over the parties and subject matter of a suit, its jurisdiction continues until a final judgment is entered." (*Wackeen v. Malis* (2002) 97 Cal.App.4th 429, 437.) Generally a final judgment "leaves nothing in the nature of judicial action to be done other than questions of enforcement or compliance." (*Ramon v. Aerospace Corp.* (1996) 50 Cal.App.4th 1233, 1237; 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 406, p. 1015 ["Jurisdiction over a cause or parties after a final judgment, order or decree is exceptional and limited to special situations"].) But here, the superior court expressly retained "jurisdiction over the construction, interpretation, implementation, and enforcement of the Settlement in accordance with its terms, and over the administration and distribution of the Settlement Sum pursuant to California Rules of Court [rule] 3.769(h) and California Code of Civil Procedure section 664.6." The court's retention of jurisdiction under section 664.6 includes "jurisdiction over both the parties and the case itself, that is, both personal and subject matter jurisdiction." (*Wackeen v. Malis*, *supra*, 97 Cal.App.4th at p. 439.)

Although the scope of such a retention of jurisdiction under section 664.6 is undoubtedly limited, it is broader than what typically remains following entry of a judgment. (See e.g. *Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360 [judge hearing a motion to enforce settlement under section 664.6 may receive evidence, determine disputed facts, and enter the terms of a settlement agreement as a judgment]; *In re Clergy Cases I* (2010) 188 Cal.App.4th 1224, 1238 [Court had jurisdiction under section 664.6 to address the dissemination of non-party confidential records, in accord with settlement agreement.]. )

In addition, the court's retention of general jurisdiction under section 664.6 includes the court's equitable authority. (§ 187 ["When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."]; *Bloniarz v. Roloson* (1969) 70 Cal.2d 143,

147 ["Unless limited by statute, [court's equitable authority] is a necessary incident of the constitutional grant of general jurisdiction."].) This equitable authority "is not restricted to setting aside the former judgment; to the contrary, the court has power to provide any appropriate equitable remedy . . . ." (*In re Marriage of Adkins* (1982) 137 Cal.App.3d 68, 77.) Every court also has the power to "provide for the orderly conduct of proceedings before it . . . [and] [t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (§ 128, subd. (a)(3), (5).)

In *Franklin & Franklin v. 7-Eleven Owners for Fair Franchising*, *supra*, 85 Cal.App.4th 1168, the court considered whether a superior court that had approved a class action settlement had the authority to enjoin former class counsel from pursuing actions on behalf of individual class members before a different superior court.   In affirming the injunction, the court relied upon the "established rule of 'exclusive concurrent jurisdiction' " to conclude the class action court had jurisdiction to act.  (*Id.* at pp. 1175–1176.)  The rule of exclusive concurrent jurisdiction provides that when two or more courts have subject matter jurisdiction over a dispute, the court that first asserts jurisdiction assumes it to the exclusion of the others.  (*Ibid*.)  It makes no matter whether the parties to the various actions and the remedies sought are not precisely the same. (*Ibid*.)  "It is sufficient for the exercise of a protective equitable jurisdiction that the attorneys' fees issue in both suits is the same and arises out of the same transactions or events."  (*Ibid*.)  So too, here.

The San Francisco Superior Court had subject matter jurisdiction over all claims arising as a result of the class action judgment and settlement.  Its authority, indeed its obligation, included protecting its decision to approve the settlement and its fairness to class and counsel by exercising its equitable power to ensure that ILG did not unduly profit at class members' expense.  This authority has been recognized to include "the  use of writs of injunction as an auxiliary remedy to protect ongoing litigation from being impaired by collateral acts of one of the parties."  (*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising*, *supra,* 85 Cal.App.4th at p. 1177.)

In this case, the record establishes that, despite entry of a final judgment, the *Lofton* settlement was incomplete in two critical respects. First, as set forth more fully above, the trial court was advised repeatedly and falsely that because ILG had negotiated a separate settlement with Wells Fargo, its clients were going to opt out of the class action. Clearly that did not happen, and it does not appear from the record before us that the court or absent class members were advised of this change, the reason for it or given any information about how this change would impact the recovery of each class member. Neither class counsel, nor ILG discussed with the court the impact the 600 plaintiffs would have on the distribution of settlement funds if they were to share in the class settlement. Both should have discussed the changing distribution of settlement. If class counsel had been more diligent, perhaps the whole issue of ILG's plan for its common fund would have been addressed in a timely fashion.

Contrary to ILG's assertion, ILG's professional obligations as officers of the court and principles of general tort law impose a duty on ILG not to knowingly mislead the court and absent class members. " 'A lawyer communicating on behalf of a client with a nonclient may not . . . [¶] . . . knowingly make a false statement of material fact . . . to the nonclient. . . .' [Citation. 'The law governing misrepresentation by a lawyer includes the criminal law (theft by deception), the law of misrepresentation in tort law and of mistake and fraud in contract law, and procedural law governing statements by an advocate. . . . Compliance with those obligations meets social expectations of honesty and fair dealing and facilitates negotiation and adjudication, which are important professional functions of lawyers.' [Citation.] 'A misrepresentation can occur through direct statement or through affirmation of a misrepresentation of another, as when a lawyer knowingly affirms a client's false or misleading statement.' [Citation.]" (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 69, citing Rest.3d, Law Governing Lawyers, § 98, pp. 58–59.) The fact that ILG was not class counsel in the *Lofton* litigation did not relieve ILG of its obligation to correct any knowing misrepresentations about the status and impact of its settlement on the pending *Lofton* settlement.

13

Second, assuming ILG's clients as class members were properly advised of their rights and affirmatively chose to remain members of the class, the court was never advised that the supplemental common fund settlement was primarily for attorneys fees or given an opportunity to consider the reasonableness of the award. Maxon's application for a TRO alleges that the $6 million dollar settlement negotiated by ILG was in fact a second fee agreement that must be considered part of the *Lofton* settlement. He argues that it was only after ILG was unable to complete its deal with Wells Fargo, which would have allowed for a full recovery of $6 million in fees, that ILG concocted the theory about the unreleased statutory claim and offered its clients $750. While ILG insists that its settlement with Wells Fargo is entirely separate from the class action settlement, the record demonstrates otherwise. The attorney fees provision of ILG's contract with its clients provides that "[i]f Attorneys resolve Client's claims, Attorneys will be entitled to either one-third of any monetary recovery obtained or Attorney's hourly fees . . ., whichever is greater, plus costs incurred." Any suggestion that almost $6 million in attorneys' fees could be justified based on the additional $750 recovery for ILG's clients is entirely inconsistent with the client fee agreement. Moreover, ILG acknowledged the undeniable link between its fee and the *Lofton* settlement in its January 2012 letter to clients when it explained that it negotiated with Wells Fargo to receive $6 million in attorney fees for work performed on claims that were primarily if not entirely resolved in the *Lofton* settlement. ILG attorney Primo confirmed in his declaration that the supplemental settlement negotiated by ILG was "contingent upon final approval of the *Lofton* class settlement." Nonetheless, ILG's claim for fees was concealed from both the court and class members during the settlement approval proceedings in violation of Rule 3.769(b). [3]

---

[3]Rule 3.769(b) requires that "[a]ny agreement, express or implied, that has been entered into with respect to the payment of attorney's fees . . . must be set forth in full in any application for approval of the dismissal or settlement of an action that has been certified as a class action."

14

Indeed, there is a question on this record whether ILG is entitled to any fees at all. A duplicative action that does nothing to contribute to a result achieved in a class action does not justify a separate award of fees. (*Thayer v. Wells Fargo Bank, N.A., supra*, 92 Cal.App.4th 841.) Courts have to be vigilant in awarding fees where multiple actions are filed alleging similar claims. "[W]hile meager fee awards to successful counsel may discourage able counsel from engaging in many forms of public interest litigation that should be encouraged, the *unquestioning* award of generous fees may encourage duplicative and superfluous litigation and other conduct deserving no such favor." (*Id.* at p. 839.) The class members were entitled to have ILG's claim for fees in variance with their fee agreement, and in such disproportion to the recovery obtained, independently reviewed by the class action court. ILG's concealment deprived them of that protection.

If the court determines that Maxon's allegations are true, it would be within the court's jurisdiction to review the supplemental fee agreement and to order the ILG attorneys to disgorge some or all of the fees already received. (*Rodriguez v. Disner* (9th Cir. 2012) 688 F.3d 645, 653–654 ["In determining what fees are reasonable, a district court may consider a lawyer's misconduct, which affects the value of the lawyer's services. [Citation.] A court has broad equitable power to deny attorneys' fees (or to require an attorney to disgorge fees already received) when an attorney represents clients with conflicting interests."]; *In re Eastern Sugar Antitrust Litig.* (3d Cir. 1982) 697 F.2d 524, 533 [upholding the disgorgement of attorneys' fees where "breach of professional ethics is so egregious that the need for attorney discipline and deterrence of future improprieties of that type outweighs" the concerns of providing "the client with a windfall" and depriving the "attorney of fees earned while acting ethically"].) Accordingly, limited proceedings designed to resolve these outstanding issues with respect to the *Lofton* settlement fall within the scope of the court's continuing jurisdiction under section 664.6, section 128 and the court's equitable authority to ensure the fair and orderly administration of justice and protect the integrity of its judgment in the class action.

Contrary to ILG's argument, the *Lofton* class members, including both ILG's 600 clients and the other absent class members, should not be put to the burden of a separate civil suit against ILG to protect the settlement funds pending resolution of its potential misconduct. Although a court may not issue a TRO against a stranger to a proceeding, a court may issue a TRO against a party's attorney. (*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising, supra*, 85 Cal.App.4th at p. 1178, [Court has " ' "duty and . . . broad authority to exercise control over a class action and to enter appropriate orders [including an injunction] governing the conduct of counsel and parties." ' "]; see also Fed. Rules Civ. Proc., rule 65(d) [Injunctions and restraining orders bind the parties to the action, their officers or agents, servants, employees, and attorneys, and those persons in active concert or participation with them.].) There is no real question that ILG represented 600 class members throughout the settlement approval process. An ILG attorney appeared at the hearing on the application for preliminary approval of the settlement to ensure that they would be able to continue representing their 600 members of the plaintiff class.

At the hearing, class counsel informed the court of his understanding of ILG's separate $6 million settlement. The court was told by class counsel that ILG's clients would seek their sole recompense from their separate $6 million settlement and not participate in the class recovery. Instead of speaking up and telling the court that, to the contrary, its clients would indeed participate in the class recovery, and that the $6 million settlement was mostly for ILG's recovery of fees, its representative stood mute. When the ILG lawyer had an opportunity to address the court, he expressed only concern over his ability to communicate directly with ILG's clients because "if the court grants the motion that's before the court now, they will suddenly become represented by class counsel and it will be a little bit of a problem for us to communicate with them if they are actually represented." According to the lawyer: "I'm just here because I have these 600 people that I want us to be able to communicate with." We know now that the intended communication told ILG's clients that it would facilitate their claims as class members for compensation from the class recovery, had dismissed their lawsuits, was willing to

16

pay each of them $750 out of the ILG settlement, and collectively sought their approval for more than $4 million in fees.  ILG actively participated in the class action approval hearing, and assisted and advised its clients to share in the class recovery.  The class action court had the authority to issue the TRO.

### 3.    *The court did not abuse its discretion in issuing the TRO.*

" 'The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court.'  [Citation.]  'A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " '  [Citation.]  'Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion.' "  (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 624.)  It has long been observed that " '[a] preliminary injunction may be properly issued whenever the questions of law or fact are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss to the opposing party will be trivial if it is granted.' "  (6 Witkin, Cal. Procedure 5th (5th ed. 2008) Provisional Remedies, § 357, p. 304, citing *Wilms v. Hand* (1951) 101 Cal.App.2d 811, 815.)

ILG contends that even if the trial court had jurisdiction, the TRO should be reversed because the relief granted was improper. ILG argues that (1) the requirement that it deposit $5 million with the court violates numerous limitations on interim relief; (2) the TRO imposes an impermissible content-based restraint on speech; (3) the TRO impermissibly restricts ILG's ability to enforce its releases with its former clients; and (4) improperly requires ILG to disclose information about its former clients.  Not so.

*The TRO comports with the requirements for interim relief.*

As noted by ILG, " 'an injunction is an unusual or extraordinary equitable remedy which will not be granted if the remedy at law (usually damages) will adequately compensate the injured plaintiff.' "  (*Deparment of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1565.)  Likewise, " '[w]here, as here, the preliminary injunction mandates an affirmative act that changes the status quo,

17

[the appellate court] scrutinize[s] it even more closely for abuse of discretion.' " (*Shoemaker v. County of Los Angeles, supra*, 37 Cal.App.4th at p. 625.)

We need not consider whether Maxon has an adequate legal remedy in his separate action against ILG because the absent class members, whose interests the court was also seeking to protect with the TRO, do not. Likewise, the trial court itself has a substantial interest in preserving the proceeds of a settlement that arguably should have been allocated and approved within the context of the class action proceedings. In light of the delayed disclosure of the settlement to class members and the attempt to mislead the court regarding the true terms of the settlement and in the absence of any evidence that the deposit order would unduly harm ILG's business, we discern no abuse of discretion in the court's requirement that ILG temporarily deposit the $5 million in a secure account.[4]

*The TRO does not impermissibly restrain ILG's speech.*

It is well-within the court's discretion to limit constitutionally protected commercial speech in class action litigation when the need for a limitation outweighs the potential interference with the rights of the parties. (*Gulf Oil Co. v. Bernard* (1981) 452 U.S. 89, 101; *Belt v. Emcare, Inc*. (E.D.Tex. 2003) 299 F.Supp.2d 664, 667–668; *Hernandez v. Vitamin Shoppe Industries, Inc.* (2009) 174 Cal.App.4th 1441, 1456.) Balancing ILG's relatively small need to communicate with its former clients at this point against the real concern that further communication by ILG may cause substantial harm to the former clients' interests, there was no error in the temporary restrictions placed on ILG's speech or ability to communicate with those former clients.

---

[4]Contrary to ILG's argument, the TRO issued in this case is not the equivalent of a writ of attachment. The TRO properly seeks to prevent dissipation of a specific asset. (*Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 135–136.) In contrast, a writ of attachment allows generally for seizure of assets to aid in the collection of a judgment following trial. (*Doyka v. Superior Court* (1991) 233 Cal.App.3d 1134, 1136–1137 [distinguishing between injunction and writ of attachment and concluding that injunction was in effect improper writ of attachment because "[b]y the time the injunction issued, [plaintiff] was no longer trying to prevent dissipation of assets; he was trying to force [defendant] to replace them with money from any and all of his bank accounts."].)

18

*The TRO does not impermissibly restrain ILG's petition rights.*

ILG argues that the restriction in the TRO prohibiting ILG " 'from taking any further action to enforce the terms of any purported release by any ILG-Client Class Member' " interferes impermissibly with ILG's ability to defend itself in the separate civil action Maxon has filed against ILG. Considering the seriousness of the allegations against ILG in this case and the court's reasonable desire to maintain the status quo while resolving its concerns about the settlement, there was no abuse of discretion with regard to this temporary restriction on ILG's ability to enforce the releases. We note, however, that if ILG believes the TRO is impairing its ability to defend the other action, ILG would be within its rights to request a preliminary injunction prohibiting Maxon from pursuing the other action until the court has resolved the issues in this case. (*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising*, *supra*, 85 Cal.App.4th 1168.)

*The TRO does not violate the privacy rights of ILG's former clients.*

The court did not infringe on the privacy rights of ILG's former clients by requiring ILG to disclose their names and addresses to the court and all counsel. "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." (*Hill v. National Collegiate Athletic Assn*. (1994) 7 Cal.4th 1, 37.) Disclosure of contact information in a class action setting does not typically pose a serious invasion of privacy, particularly if the information has previously been released. (*County of Los Angeles v. Los Angeles County Employee Relations Com*. (2013) 56 Cal.4th 905, 928–930; *Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 372–373.) Here the names and addresses of all *Lofton* class members, including the ILG clients, have already been disclosed to the *Lofton* class settlement administrator and used to distribute settlement proceeds. Thus, the additional disclosure ordered by the court does not pose a significant threat to the clients privacy and any potential invasion is outweighed by the need to protect their interests.

**4.      *ILG's evidentiary objections are harmless.***

ILG contends that the court erred in relying on inadmissible evidence subject to

19

mediation confidentiality.[5] We need not consider this evidentiary objection, however, because any potential error was harmless in light of the substantial admissible evidence before the court supporting its issuance of the TRO. Without detailing all of the admissible evidence, the following evidence is particularly compelling: ILG's January and August 2012 letters to their clients, the declaration of Mark Primo, and the record of the settlement approval proceedings in this class action.[6]

Contrary to ILG's argument its letters were not subject to exclusion under Evidence Code section 1152.[7] The January letter cannot be reasonably construed as a compromise offer of settlement intended to resolve any claims based on ILG's misconduct. The August letter was not submitted to establish ILG's liability for any loss but rather to establish the risk of imminent harm that would justify issuance of the TRO. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 296 [Section 1152 "is not an absolute bar to liability since a settlement document may be admissible for a purpose other than proving liability."].)

---

[5]Specifically, ILG identifies the following evidence as being inadmissible: "(1) an unexecuted, draft 'Term Sheet' that [Maxon] acknowledges came from a mediation (AA 1036:10-11); (2) correspondence between ILG attorney Marc Primo and Wells Fargo's counsel, Lindbergh Porter (including a draft stipulation for dismissal), exchanged during continued mediated negotiations; and (3) numerous references to, descriptions of, and disclosures of mediation-related communications, writings, and documents, including statements made in open court and prior filings."

[6]Respondent's request for judicial notice and motion to supplement the record, filed July 3, 2013 is denied.

[7]Evidence Code section 1152, subdivision (a) provides in relevant part "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

20

**Disposition**

The appeal from the order granting intervention is dismissed. The temporary restraining order is affirmed.  Intervenor David Maxon shall recover his costs on appeal.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Jenkins, J.

Trial Court: Superior Court of the City and County of San Francisco

Trial Judge: Honorable Harold E. Kahn

Counsel for Objector and Appellant: Natalie P. Vance
Gregory T. Fayard
Leah A. Plaskin
KLINEDIST PC

Sean M. SeLegue
ARNOLD & PORTER LLP

Counsel for Intervener and Respondent: Mark A. Chavez
Nance F. Becker
CHAVEZ & GERTLER LLP

Richard Zitrin
ZITRIN LAW OFFICE

David C. Anderson
ANDERSON LAW