Filed 9/28/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAWN LOFTON et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>WELLS FARGO HOME MORGAGE, A DIVISION OF WELLS FARGO BANK, N.A.,<br><br>    Defendant and Respondent. | A146282<br><br>(City & County of San Francisco Super. Ct. No. CGC-11-509502) |
| INITIATIVE LEGAL GROUP, APC,<br>    Appellant,<br>v.<br>TERRI MAXON,<br>    Intervenor and Respondent. | |

In *Lofton v. Wells Fargo Home Mortgage* (2014) 230 Cal.App.4th 1050 (*Lofton I*), we affirmed a temporary restraining order (TRO) that required appellant Initiative Legal Group, APC (ILG) to deposit into a court supervised escrow account over $5 million of settlement proceeds it claimed were attorneys' fees in cases it brought against Wells Fargo on behalf of some 600 former clients. The TRO was predicated on an allegation that ILG's clients were in fact members of a class compensated by a $19 million settlement of class action claims approved by the San Francisco Superior Court in this case, *Lofton v. Wells Fargo Home Mortgage* (*Lofton*), and that ILG was compensating itself out of its separate settlement without court approval for class claims resolved by the *Lofton* settlement.

The Factual and Procedural Background portion of our *Lofton I* opinion sets forth the unique factual context of this case. In part, those facts showed that ILG

concealed from the *Lofton* court and its class member clients the $6 million settlement with Wells Fargo for payment of its attorney's fees in violation of California Rules of Court, Rule 3.769 (b). (*Lofton, supra*, 230 Cal.App.4th at p. 1063)

In light of ILG's attempt to arrogate to itself millions in fees for claims resolved in *Lofton*, we queried whether the record would support any fee award to ILG and indicated that, if the allegations supporting the TRO were true, "it would be within the court's jurisdiction to review the supplemental fee agreement and to order the ILG attorneys to disgorge some or all of the fees already received." (*Lofton I, supra*, 230 Cal.App.4th at p. 1064.) We held that consideration of these issues on remand would "fall within the scope of the court's continuing jurisdiction under [Code of Civil Procedure] section 664.6, section 128 and the court's equitable authority to ensure the fair and orderly administration of justice and protect the integrity of its judgment in the class action." (*Lofton, I, supra*, 230 Cal.App.4th at p. 1068.)

On remand, the trial court considered exactly those issues and more, and concluded ILG was not entitled to an award of attorney's fees. The monies on deposit with the court were instead directed to be paid to the *Lofton* class members who participated in the settlement, including ILG's clients. ILG and parties who sought to intervene and vacate the *Lofton* and ILG settlements appeal. We affirm.

BACKGROUND

A. *The Parties*

Plaintiffs and respondents Lofton, et al., are a class of home mortgage consultants who alleged they were misclassified as exempt employees by Wells Fargo. Since 2005, they were represented by class counsel Kevin McInerney and James Clapp. (*Lofton, I, supra*, 230 Cal.App.4th at p. 1054.) Appellant ILG is a law firm that represented approximately 600 Wells Fargo home mortgage consultants alleging the same claim as the Lofton class in multiple lawsuits brought on behalf of 30 to 90 plaintiffs in each. (*Id.* at p. 1055.) Marc Primo Pulisci, G. Arthur Meneses, Joseph S. Liu and Monica Ballarama were attorneys affiliated with ILG. Mark Yablonovich was an attorney formerly affiliated with ILG who filed the putative class action *Peña v. Wells Fargo* that was

2

dismissed because its claims were resolved by the *Lofton* settlement.[1]  Burke Huber was an attorney affiliated with Yablonovich.  Appellants Linda Summers and Marsha Kaye are members of the *Lofton* class and were clients of ILG.  They sought to intervene following our remand and moved to vacate the *Lofton* and ILG settlements.  Yablonovich and Huber represented Summers and Kaye respectively when the motions to intervene were filed but withdrew when motions to disqualify them from such representation were pending.  Respondent Wells Fargo Home Mortgage is the defendant in *Lofton* and in the individual and putative class cases filed by ILG and Yablonovich.  Respondent Maxon is also a member of the Lofton class and former client of ILG.[2]  In September 2012, Maxon filed a putative class action against ILG and four of its attorneys for secretly settling its clients' claims with Wells Fargo without their knowledge or participation.  (*Lofton*, *supra*, 230 Cal.App.4th at p. 1058)  At the same time, Maxon intervened in this case and obtained the temporary restraining order that we affirmed in the previous appeal, freezing the funds ILG was to pay itself out of the Wells Fargo settlement.  (*Id*. at pp. 1059-1060)  Maxon is represented by Mark Chavez and Richard Zitrin.

*B. The Proceedings on Remand*

Following our remittitur, the superior court conducted a case management conference in April 2015, issued an order directing the parties to provide detailed information about the Lofton and ILG settlements, invited motions for attorneys' fees, and set June 24, 2015 as a hearing date for injunctive relief, pending motions and applications, including "[t]he status and determination of the disposition of the $5.9 million Wells Fargo transferred to ILG."  At that time, there were before the court motions to intervene filed by appellants Kaye, Summers and others, Summers' motion to vacate the *Lofton* judgment, Maxon's motion for an injunction and to enforce the settlement agreement, Maxon's motion for attorney's fees and a slew of evidentiary

---

[1] Peña v. Wells Fargo Bank, L.A. Superior Court, No. BC449501.

[2] Mr. Maxon passed away while the remand proceedings were underway.  His status as an intervenor has been assumed by his widow as his successor in interest.

3

objections and requests for judicial notice. We will discuss only the evidence and proceedings concerning the issues raised in this appeal.

### 1. *The Summers/Kaye Intervention Motion*

Summers moved to intervene and to vacate the *Lofton* judgment and the ILG settlement Kaye joined in Summers' motion. The motion to vacate the judgment was supported with a declaration from Summers' attorney Mark Yablonovich who was present at the 2011 mediation between Wells Fargo, the *Lofton* plaintiffs and ILG. The Yablonovich declaration contains facts specifying the scope of his representation of Ms. Summers, but otherwise contains no factual showing supporting the need or timeliness for her intervention. The court denied the motion as untimely and because it would unduly enlarge the issues before the court.

### 2. *ILG's Arguments Before the Court at the Injunction Hearing*

ILG raised a host of challenges to the court's ability to consider and order any disposition of the settlement fund it negotiated with Wells Fargo. First, it argued that the court had no jurisdiction over the ILG settlement insofar as the court was relying on the concept of exclusive concurrent jurisdiction. Second, it argued the court's equitable power did not extend to any remedy designed for a subclass of the *Lofton* class (ILG clients) who had an adequate remedy at law in their separate action against ILG filed in September 2012. It then argued that any relief ordered in this case that characterized the ILG settlement funds as anything other than a private agreement between ILG and its 600 clients would require the court to vacate both settlements, and provide, at the very least, new notices to the plaintiffs and the opportunity to opt out of the *Lofton* class. Finally, ILG argued that any final order of distribution of the funds would be premature because there were issues concerning a group of plaintiffs represented by McInerny and Clapp who did not participate in the settlement, and proceeding to the merits on the record developed before the court would deny ILG its rights to due process under law.

4

*3. Home Mortgage Consultant Litigation Against Wells Fargo As It Bore Upon Exclusive Concurrent Jurisdiction.*

The first case was *Mevorah v. Wells Fargo Home Mortgage* (*Mevorah*) filed in 2005 by counsel Kevin McInerney in San Francisco Superior Court on behalf of a putative class. Wells Fargo removed that case to federal court. The Northern District of California certified the case as a class action, but the Ninth Circuit vacated certification and remanded the case back to the district court. *Mevorah* was pending before the district court, and class counsel was going to file a renewed motion for class certification when Wells Fargo agreed to the mediation in *Mevorah* that settled the class claims. The instant case (*Lofton*) was filed in the San Francisco Superior Court on March 24, 2011 for the purpose of seeking approval of the class settlement agreed to in the *Mevorah* mediation. Class counsel explained in seeking approval that *Lofton* was filed in state court to avoid addressing whether certification of the class could be done under federal law in *Mevorah*, even for settlement purposes. *Mevorah* was voluntarily dismissed in December 2011 following approval of the *Lofton* settlement.

After *Mevorah* was filed in 2005 but before *Lofton* was filed in 2011, ILG filed a dozen cases on behalf of groups of home mortgage consultants against Wells Fargo. One of them, *Strickler v. Wells Fargo Bank* (*Strickler*), was a PAGA representative action, and at least one, *Hollander v. Wells Fargo Bank* (*Hollander*), was a class action. The other 10 were individual cases filed on behalf of groups of the 600 mortgage consultants who had retained ILG.[3] Another class action, *Peña v. Wells Fargo* (*Peña*), was filed by Mark Yablonovich in 2010. Yablonovich was a founding partner of ILG who left the firm in 2009 and was listed by ILG as the lead attorney in *Strickler* and *Hollander*. "Each of the ILG Actions (with one possible exception) and *Peña* advanced claims that overlapped with those alleged in *Mevorah* and, as discussed below were released by the *Lofton* settlement and extinguished by the judgment in this action." That possible

---

[3] PAGA refers to a claim filed pursuant to the Private Attorneys General Act of 2004, California Labor Code section 2698, et seq.

5

exception is *Mather v. Wells Fargo Bank* (*Mather*), filed in San Francisco Superior Court which, in addition to the wage and hour claims, included a claim for a $750 Penalty for Wells Fargo's failure to provide employment records upon demand in violation of Labor Code section 226.

The trial court relied on our 2014 holding in *Lofton I* as law of the case to conclude it had jurisdiction to consider the propriety of the settlement of class member claims, including those class members represented by ILG on class or related claims.

3. *Facts Surrounding the Lofton Settlement*

The formal mediation to resolve the *Mevorah* case, the ILG actions and *Peña* was convened in San Francisco on February 15, 2011. The parties were separated into three rooms by the mediator. *Mevorah* class counsel were in one room. Marc Primo of ILG and Yablonovich were in another, and Wells Fargo's lawyers were in the third. The mediation lasted most of the day. Class counsel reached an agreement with Wells Fargo to settle the *Lofton* claims for $19 million. The superior court sustained ILG's assertion of the mediation privilege to protect events within the February 15 mediation that occurred between ILG, Yablonovich and Wells Fargo.

Following the mediation, class counsel undertook to draft the settlement agreement, class notice and motion for preliminary approval. In April 2011 the documents were filed, and the preliminary approval hearing was held before the San Francisco Superior Court. Arthur Meneses of ILG and Michael Coats from the office of Mark Yablonovich attended the hearing. Each sought to have the hearing continued. Meneses expressed a concern that certification of the *Lofton* class would impair ILG's ability to communicate with its 600 clients because "they will suddenly become represented by class counsel." Coats sought the continuance to "look into" the effect of the settlement upon the *Peña* case.

Class counsel McInerney assured the court that counsel in *Lofton* had no intention of contacting any of ILG or Yablonovich's clients, and stated: "These individuals' cases that these gentlemen have been referring to were essentially settled on the very same day in front of the very same mediator, David Rotman, back on February 15th and all the

6

details of who would be in the proposed class. Everything else was worked out. Wells has a separate settlement agreement with these folks." McInerney went on to explain that: "Indeed the thought of the settlement was that these gentlemen representing the two firms would have all their individual plaintiffs opt out. If they did not, then they would be covered by the proposed class settlement."

No one present at the preliminary hearing spoke up to contradict McInerney, or to correct or clarify what he said about the resolution of the cases. Indeed, counsel for Wells Fargo appeared to confirm what McInerney told the court saying: "The parties, all of the parties and their counsel, who are here resolved these cases in mediation and we are proceeding I think consistent with that resolution." The superior court granted preliminary approval of the *Lofton* settlement.

The class was defined as: "All persons who at any time from February 10, 2001, through March 26, 2011, are or were employed by Wells Fargo Bank, N.A. ("Wells") as an overtime exempt home mortgage consultant (HMC) in the state of California and who do not opt-out of this action." Class members were notified that they could submit claim forms to participate in the settlement, opt-out or object if they chose not to. The settlement included a broadly worded release. Class members were also given notice that they would be paid from a net settlement fund, and their payments "will increase if not all eligible members submit claims. Your amount will also increase if the Court declines to approve the fees requested by Class Counsel, the reimbursement of litigation expenses, the enhancement payment to the Class Representative, or the fees of the Claims Administrator." Requests to opt-out or object were due June 27, 2011, and claim forms were due July 12, 2011.

Contrary to McInerney's understanding, neither ILG nor Yablonovich advised their clients to opt out of the *Lofton* settlement. Instead, they encouraged their clients to accept the *Lofton* settlement and even directed clients to submit their claims to ILG for forwarding, not to the settlement administrator listed on the claim form. ILG clients were also told that if they did not participate in the *Lofton* settlement they would receive no compensation for the wage and hour claims ILG brought on their behalf. None of the

7

ILG clients opted out of the *Lofton* settlement, and ILG conceded before the trial court that its clients were members of the *Lofton* class. The court on remand observed that ILG had the opportunity to refute the allegations that it directed all of its clients to participate in the *Lofton* settlement, but it offered no such evidence. Accordingly, the court concluded that all the wage and hour claims advanced in the ILG actions were extinguished by *Lofton*.

### 4. ILG's Agreement with Wells Fargo

The ILG agreement with Wells Fargo was characterized before the court at the hearing following remand as more inchoate than McInerney and Wells Fargo perceived and represented to the court at the preliminary approval hearing. Counsel for Wells Fargo said that "[a]s of the date of the preliminary approval hearing, Wells Fargo had a tentative settlement with ILG regarding its clients in which Wells Fargo would pay an as yet undivided $6 million for their complete release of any and all claims or potential claims in their individual lawsuits against Wells Fargo. The tentative settlement required each of ILG's clients to provide a release to Wells Fargo for their individual claims. [¶] From Wells Fargo's standpoint, there was no change to the terms of the settlement with ILG after the date of the preliminary approval hearing. However, a dispute arose between Wells Fargo and ILG and/or between ILG and its clients concerning the tentative agreement and releases." ILG's Primo said, "[a]s of the preliminary approval hearing there was no enforceable settlement or agreement."

Both Wells Fargo and ILG said they continued to negotiate with the help of the mediator until January or February 2012. All of these settlement negotiations took place without the knowledge, consent or authorization of ILG's clients.

In January 2012, ILG's clients were first informed of the results of its settlement talks with Wells Fargo. In a form letter, sent almost six months after judgment was entered in *Lofton*, ILG told its clients that in return for a signed release of Wells Fargo's liability, each of them would receive $750 as compensation for a claim brought under Labor Code section 226 subdivision (b) for Wells Fargo's failure to produce employment records. The balance of the $6 million settlement (approximately $5.5 million) was to be

8

"for the fees and costs incurred by [ILG] since May 15, 2006 for work performed on litigation involving Wells Fargo including three class actions, a labor code private attorney general action, and the approximately 600 individual actions, including yours that were resolved by *Lofton*."

Enclosed with the letter was a "Confidential Individual Release and Acknowledgement" to be signed by ILG's clients in order to receive their money. The Confidential Release was to be signed only by the ILG client, and contained a broadly worded release of Wells Fargo for all claims included in *Lofton* or the ILG cases. The Confidential Release also included the following paragraphs describing the settlement and reciting its purpose:

"A total of $6,000,000 has been negotiated by Initiative Legal Group APC (ILG) in connection with the final resolution of approximately 600 cases against Wells Fargo, including yours, along with four representative actions with class claims that were released as the result of the *Lofton v. Wells Fargo* class action settlement in which you participated: *Peña v. Wells Fargo*, *Hollander v. Wells Fargo*, *Mather v. Wells Fargo*, and *Strickler v. Wells Fargo*.

"We propose, and by signing below you agree, to an allocation of $750.00 to each of the approximately 600 individuals, including yourself. This will leave the remaining monies, approximately $5,520,000 for ILG. Wells Fargo has not specified or agreed to any allocation toward attorney's fees. Consequently, the allocation is based solely on an agreement between individual plaintiffs and ILG.

"The upcoming dismissal of your lawsuit is not contingent on any action by you, since you already released your claims in favor of Wells Fargo in connection with your participation in the *Lofton* settlement. However, your supplemental release and acknowledgement is a requirement to receive this additional payment. All you need to do to receive your $750 is sign below and return this release and acknowledgement to ILG . . . ."

Approximately 570 of ILG's clients returned a signed Confidential Release, and the Confidential Releases are the only documentation supporting Wells Fargo's

9

agreement to pay $6 million to ILG and its clients.  Once the ILG clients signed the Confidential Releases, Wells Fargo deposited $5,888,749 with the same firm that administered the *Lofton* settlement.  Each of ILG's clients got $750, for a total payout of $431,250. In addition to $750, the ILG clients who served as the putative class representatives – Laura Strickler, Michael Hollander and Paula Peña – each received $7,500 at ILG's direction for their "effort". None of these payments were disclosed to the courts in which those class actions were pending when they were dismissed. The settlement administrator paid itself $9,499 for its services, and ILG was paid $5,425,500 for its "Attorney's Fees and Costs."

5.  *ILG's Supplemental Settlement with Its Clients.*

At least one of the ILG clients balked at the proposed allocation between client payments and attorney's fees contained in the letter and Confidential Release that explained the deal between ILG, ILG's clients and Wells Fargo.  As a result, ILG made a supplemental proposal "to avoid a potentially protracted dispute with our clients, we are proposing to settle any potential claims you may have by paying you an additional $1,000 in exchange for you executing a settlement agreement and release of all claims."  ILG paid $1,000 to each of 495 clients who accepted this offer.  But 5 ILG clients were unwilling to accept the $1,000.  They negotiated additional amounts for their releases, and ILG paid them collectively $9,391.

The release prepared by ILG for the additional $1,000 payment provided a further justification to its clients for its $5 million fee from the settlement.  It stated: "The *Lofton v. Wells Fargo* class action settlement resulted in payments totaling approximately $12,286,824 to the class members, of which you are one.  [¶]  ILG was not class counsel and received no fees or costs from the *Lofton* settlement. . . . ILG negotiated a proposed settlement with Wells Fargo.  As part of that proposed settlement, you would receive an additional $750 above and beyond your *Lofton* settlement payment.  Wells Fargo also agreed and did pay $5,448,000 to ILG for attorneys' fees and costs, slightly less than the $5,520,000 amount estimated in the January 2012 correspondence.  The amount paid to ILG was to cover the legal services performed over the six years of litigation.  [¶]  The

10

*Lofton* case settled overlapping claims asserted by ILG on behalf of 600 clients. Additionally, ILG obtained $750 per client as a result of the *Mather* action. In light of the settlement in the *Lofton* action, as well as the *Mather* action, all of plaintiffs' actions were dismissed."

The Confidential Release summarized at length the efforts undertaken by ILG in the *Strickler* and *Hollander* cases and described its efforts in *Mather* as only filing suit.

6. *The Trial Court's Rulings Contested in This Appeal.*

The trial court issued a detailed and thorough order following the June 2015 hearing on injunctive relief, and painstakingly ruled on over 100 pages of evidentiary objections and claims of privilege. None of the specific evidentiary rulings are challenged in this appeal. The rulings on the privilege claims are challenged only in the broadest sense that by relying on *Lofton* class counsel's description of the results of the *Mevorah* mediation in the preliminary approval hearing and in the hearing on injunctive relief the superior court violated the mediation privilege.

In addition to the challenge to the court's jurisdiction and the denial of intervention by Summers and Kaye, ILG challenges the court's determination that its attorneys' fees belonged to the *Lofton* class and should be distributed to class members who filed a claim in *Lofton*. ILG also challenges the trial court's order that ILG reimburse the settlement fund for the amounts paid by ILG to Stickler, Hollander and Peña for their efforts as class representatives.

DISCUSSION

A. *The Summers/Kaye Intervention Motion*

Intervention in an action or proceeding is governed by Code of Civil Procedure section 387.[4] As section 387 existed at the time Summers and Kaye sought intervention, it could be obtained permissively with approval of the superior court when the proposed intervenor had an interest in the action or proceeding, or as a matter of right when

_____

[4] Further statutory references are to the Code of Civil Procedure unless otherwise designated.

11

intervention was conferred under a provision of law.[5] (§ 387, subdivisions (a) & (b) as enacted, Stats. 1977, p. 1486, Section 1.) But whether permissive or as a matter of right, a party's proposed intervention must be timely. (*Ibid.*)

The determination of the timeliness of intervention is committed to the discretion of the trial court, and we review such a determination for an abuse of discretion. (*Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 109.) Timeliness is measured from "the date the proposed interveners knew or should have known their interests in the litigation were not being adequately represented." (*Ziani Homeowners Assn. v. Brookfield Ziana LLC* (2015) 243 Cal.App.4th 274, 282.) Looking at Summers and Kaye's proposed intervention through this lens, we conclude the superior court did not abuse its discretion in denying intervention.

Summers and Kaye were members of the *Lofton* class and clients of ILG. They were notified of and participated in the *Lofton* settlement, the ILG settlement with Wells Fargo and, most significantly, ILG's supplemental settlement with its clients in August 2012. They argue their proposed intervention in May 2015 was timely because they acted soon after the remand from this court following our decision in *Lofton I*, and not long after they learned that ILG's clients "diluted the settlement pool" and that class counsel in *Lofton* had 30 clients who did not participate in the settlement. Nonsense.

In the first instance, the record contains no factual showing in the form of declarations from either Summers or Kaye specifying what they knew and when they learned it. Moreover, the record shows that they should reasonably have suspected their interests were not adequately represented when ILG approached them in August 2012 and sought their release of any and all claims against ILG for the additional payment of $1,000, just as Mr. Maxon suspected at that time. The superior court did not abuse its discretion in determining that Summers' and Kaye's motions to intervene were untimely.

---

[5] Section 387 was amended effective January 1, 2018. (Stats. 2017, c. 131 (AB 1693), sec. 1.)

## B. *The Basis for the Court's Jurisdiction*

In *Lofton I*, ILG contested the trial court's authority to issue the temporary restraining order challenged in that appeal, in part, because ILG was neither a defendant nor counsel for the class in the *Lofton* case. (*Lofton I*, *supra*, 230 Cal.App. 4th at p. 1061.) We disagreed and held that the court had authority to issue the restraining order under the concept of exclusive concurrent jurisdiction, "section 664.6, section 128 and the court's equitable authority to ensure the fair and orderly administration of justice and protect the integrity of its judgment in the class action." (*Id*. at pp. 1065, 1062.)

Now ILG argues the superior court had no jurisdiction for the relief ordered in this case because, "there was simply no basis in the record on which the trial court could assert exclusive concurrent jurisdiction." ILG chides us for relying on that concept because "the factual showing made after remand demonstrated the *Mevorah* action (the purportedly 'first filed' action) was not pending in any California court at the time the court below purported to assume jurisdiction." ILG's renewed challenge to the trial court's jurisdiction fails for three reasons.

First of all, as the above-quoted language from *Lofton I* makes clear, we did not affirm the trial court's authority to issue the temporary restraining order solely in reliance on the concept of exclusive concurrent jurisdiction. The superior court's jurisdiction over this dispute and ILG was also proper under its equitable authority to ensure the fair and orderly administration of justice, its statutory power to do the same conferred by section 128, subdivisions (a)(3) and (5), and in the exercise of its jurisdiction retained to enforce and supervise execution of the *Lofton* settlement under section 664.6. ILG's opening brief does not challenge any of these bases for the court's jurisdiction in this appeal. Rather, ILG argues in its reply brief that exercise of the trial court's equitable authority and power under sections 128 and section 664.6 could only have been proper in the context of exclusive concurrent jurisdiction. That is not what we said in *Lofton I*, nor does ILG provide any authority to support its claim that the court was powerless to exercise its authority over ILG and its $6 million settlement in reliance on these independent bases for jurisdiction.

13

We also have no difficulty in concluding on this record that the *Mevorah* case indeed provided a basis for the application of the doctrine of exclusive concurrent jurisdiction. ILG acknowledges that *Mevorah* was a "first-filed" action pending in the San Francisco superior court when ILG filed its cases. But, it says *Mevorah* "could not provide the basis for the exercise of exclusive concurrent jurisdiction, because it was not pending in any California court at the time" the superior court reviewed ILG's $6 million settlement. (Italics omitted.) At that time, *Mevorah* had been removed and remained pending in federal court while the proceedings were ongoing in *Lofton,* and was not dismissed until December 2011 after the *Lofton* settlement was approved. This argument is unduly formalistic and ignores the substance of the *Lofton* action. Both *Mevorah* and *Lofton* were brought on behalf of the same class of plaintiffs, asserted the same claims against the same defendant and were filed by the same class counsel. The mediation confidentiality agreement for the February 2011 mediation reflects that the parties were trying to settle *Mevorah*, and lawyers from ILG and Yablonovich are signatories. Yes, Lofton is a different class representative than Mevorah, but class counsel explained that *Lofton* was filed to approve the settlement in San Francisco superior court in order to avoid certification issues that could arise under federal law. Once *Lofton* was approved, *Mevorah* was dismissed. In these circumstances, we have no difficulty in concluding that *Lofton* was a continuation of the *Mevorah* action just as we would so certainly conclude if *Mevorah* were remanded to the state court. The cases in substance were the same.

Finally, ILG makes no mention of the possible import of *Mather* which was filed before *Lofton,* pending before the San Francisco superior court when the *Lofton* settlement was approved, and served as the basis for ILG's payment of $750 to each of approximately 600 clients out of its $6 million settlement with Wells Fargo. ILG dismissed *Mather* with prejudice in April 2012. The dismissal reads in part, "As a condition of this dismissal, the parties waive their rights to seek or recover any fees and costs incurred in this action except as provided for in the parties' confidential settlement agreement; and [¶] This Request for Dismissal arises from and is based upon the Plaintiffs' participation in and recovery for those claims being dismissed with prejudice

14

made as part of the class action settlement in a related action entitled *Lofton v. Wells Fargo Home Mortgage*, San Francisco County Superior Court Case No. CGC-11-509502." There can be no credible suggestion that the superior court had no authority to review the relationship between the basis for dismissal in *Mather*, the *Lofton* settlement and the waiver of the right to seek attorney's fees as articulated in the *Mather* dismissal.

ILG's challenge to the superior court's assertion of jurisdiction over it and the proceeds of the $6 million settlement with Wells Fargo is without merit.

*C. Characterization of the ILG Settlement.*

ILG argues the trial court erred in concluding that the fees paid to ILG out of the ILG settlement with Wells Fargo " 'are properly construed as class action attorneys' fees which required approval' " by the *Lofton* court. According to ILG, "The question before this Court is the legal soundness of the lower court's conclusion that the ILG's clients' subsequent settlements with Wells Fargo are 'properly construed' as part of the class settlement." ILG's briefs suggest the trial court penalized its clients by ruling "that ILG's claimed fees are properly construed as class action attorneys' fees which should have been disclosed to the Court as part of the resolution of *Lofton*." ILG says, "There was nothing untoward in ILG's clients taking advantage of a class settlement that was deliberately intended to include their claims." We agree. But this case is not about ILG's clients. It is about ILG and the basis for its appropriation of more than $5 million as attorneys' fees, without court approval, out of a $6 million settlement fund secured on behalf of those 600 clients.

ILG says our review of the court's characterization and disposition of its fees should be de novo. We disagree. We review an order for injunctive relief for an abuse of discretion. " 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' [Citations.] The burden is on the party challenging the ruling to demonstrate such abuse." (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 801.) "Notwithstanding the applicability of the abuse of discretion standard of review, the specific determinations underlying the superior court's

15

decision are subject to appellate scrutiny under the standard of review appropriate to that type of determination. [Citation.] For instance, the superior court's express and implied findings of fact are accepted by appellate courts if supported by substantial evidence, and the superior court's conclusions on issues of pure law are subject to independent review." (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739.)

The court's decision "that the $5,425,000 which ILG claims it is entitled to as attorneys' fees belong to the *Lofton* class" was factual, and supported by undisputed evidence. That evidence showed: "(a) all of the ILG clients are members of the *Lofton* Class; (b) ILG appeared at the preliminary approval hearing in *Lofton* (and failed to correct Class Counsel's misunderstanding that the ILG Clients had their own settlement with Wells Fargo); (c) ILG encouraged and directed its clients to make claims from the *Lofton* settlement, even filing claim forms for its clients (essentially diluting the monies available to the other *Lofton* claimants); (d) ILG's claimed entitlement for fees is based (almost) entirely for work performed on claims that were extinguished by the *Lofton* Settlement; and (e) ILG never disclosed the existence of the purported fee agreement to, or sought approval of it from, *any* court, let alone this Court." The determination that the ILG fee belongs to the *Lofton* class was supported by substantial evidence and was not an abuse of discretion.

That factual determination is consistent with the law surrounding attorney's fees out of common fund recoveries. "California has long recognized, as an exception to the general American rule that parties bear the costs of their own attorneys, the propriety of awarding an attorney fee to a party who has recovered or preserved a monetary fund for the benefit of himself or herself and others. In awarding a fee from the fund or from the other benefited parties, the trial court acts within its equitable power to prevent the other parties' unjust enrichment. . . . Because it distributes the cost of hiring an attorney among all the parties benefitted, a common fund fee award has sometimes been referred to as 'fee spreading.' [Citations.] [¶] . . . [¶] Class action litigation can result in an attorney fee award pursuant to a statutory fee shifting provision or through the common fund doctrine when, as in this case, a class settlement agreement establishes a relief fund from

16

which the attorney fee is to be drawn." (*Laffitte v. Robert Half Internat., Inc.* (2016) 1 Cal.5th 480, 488-489.) Such is the case here. *Lofton* was a common fund settlement. The monies in the settlement fund belonged to the members of the *Lofton* class, and fee awards could be paid out of it under the principle of "fee spreading."

This same principle applies with equal force to the ILG agreement with Wells Fargo. It also was a common fund settlement. Wells Fargo agreed to pay a lump sum of $6 million in return for individual releases of claims from ILG's clients. The releases are explicit. "Wells Fargo has not specified or agreed to any allocation toward attorney's fees. Consequently, the allocation is based solely on an agreement between individual plaintiffs and ILG." The cases make clear that fee allocation in a common fund setting is not just a matter of private agreement between lawyers and their clients, as ILG contends. Rather, such an allocation is done through the equitable power of the court to prevent unjust enrichment. In the usual case, the court's power is employed to prevent the unjust enrichment that would accrue to some beneficiaries of the litigation by "fee spreading" the cost of the litigation so it is not borne entirely by the parties that pursued recovery for the benefit of themselves and others. (*Laffitte v. Robert Half Internat., Inc*, *supra*, 1 Cal.5th at pp. 488-489.) But it is equally apparent that courts awarding attorneys' fees from a common fund recovery ensure that those fees are reasonable and don't unjustly enrich the attorneys at their clients' expense. (See, *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19; *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819; *In re Vitamin Cases* (2003) 110 Cal.App.4th 1041.)

*D. The Court's Decision to Award the ILG Funds to the Lofton Class.*

In light of our affirmance of the superior court's ruling that the portion of the ILG settlement claimed as fees belonged to the *Lofton* class, we next consider whether the court erred in directing that the nearly $5 million on deposit with the trial court be paid to the class instead of to ILG for an attorneys' fee. In *Lofton I* we observed that, "there is a question on this record [supporting the temporary restraining order] whether ILG is entitled to any fees at all. A duplicative action that does nothing to contribute to a result achieved in a class action does not justify a separate award of fees. [Citation.] Courts

17

have to be vigilant in awarding fees where multiple actions are filed alleging similar claims. '[W]hile meager fee awards to successful counsel may discourage able counsel from engaging in many forms of public interest litigation that should be encouraged, the *unquestioning* award of generous fees may encourage duplicative and superfluous litigation and other conduct deserving no such favor.' [Citation.] The class members were entitled to have ILG's claim for fees in variance with their fee agreement, and in such disproportion to the recovery obtained, independently reviewed by the class action court." (*Lofton, I,* 230 Cal.App.4th at p. 1064.)

On remand, the superior court invited and set a deadline for "[a]ny motion for attorney fees, other than those previously awarded." In response, intervenor Maxon filed a motion for attorneys' fees, but ILG did not. Instead, ILG challenged the authority of the court's jurisdiction over this dispute, whether permanent relief was appropriate, whether the question of ILG's fees should be resolved in *Lofton* or another case and whether any relief ordered would require vacatur of the *Lofton* settlement and new notice to the plaintiff class. But ILG did not seek an award of attorneys' fees.

In *Lofton I* we stated that if the record on remand proved that the attorneys' fees claimed by ILG out of its settlement with Wells Fargo were class action fees attributable to *Lofton*, "it would be within the court's jurisdiction to review the supplemental fee agreement and to order the ILG attorneys to disgorge some or all of the fees already received." (*Lofton I*, *supra*, 230 Cal.App.4th at pp. 1064, 1059.) Here, we have affirmed the trial court's factual and legal determinations that the ILG settlement money belonged to the *Lofton* class.

Just what should be paid out of that money as attorneys' fees is a determination we entrust to the discretion of the trial court judge. "[W]e presume that our trial judges are well aware of their responsibilities as 'fiduciaries' for the protection of absent class members. [Citations.] . . .The court has a duty, independent of any objection, to assure that the amount and mode of payment of attorneys' fees are fair and proper, and may not simply act as a rubberstamp for the parties' agreement. [Citation.] ' "The evil feared in some settlements—unscrupulous attorneys negotiating large attorneys' fees at the

18

expense of an inadequate settlement for the client—can best be met by a careful . . . judge, sensitive to the problem, properly evaluating the adequacy of the settlement for the class and determining and setting a reasonable attorney's fee. . . ." ' [¶] We also start from the proposition that the ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' [Citations] For this reason '[o]ur review of the amount of attorney fees awarded is deferential.' [Citations.] We apply an abuse of discretion standard. [Citation.] Fees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award." (*Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 555-556.)

In the absence of any motion by ILG seeking an award of attorneys' fees, there is no basis in this record to support an argument that the superior court abused its discretion in refusing to award them. Instead, the record shows the trial court's decision to award the $5 million to the *Lofton* class was entirely justified. ILG directed its clients to make claims in the *Lofton* settlement, never advised its clients of the potential benefits of opting out of *Lofton*, never advised its clients at the time *Lofton* was settled that it was negotiating a separate agreement with Wells Fargo, and never secured its clients consent or authorization to enter into the separate agreement. Moreover, ILG never disclosed "the existence of the purported fee agreement to, or sought approval of it from, *any* court. [¶] . . . [¶] Having concealed its purported fee agreement from the Court, and having tried to appropriate those funds to itself without Court approval, [the superior court determined] that ILG is not entitled to any of the claimed fees." We agree.

" 'Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards.' " (*In re Bond* (1934) 31 P.2d, 921, 922.) "It should be the duty of an attorney to endeavor to raise the standards of his profession rather than to lower its integrity and prestige. An attorney at law should zealously and continuously enforce his attentions to strive to maintain the essentials of a

19

fair private and professional character, guarding against their loss through questionable personal and professional conduct and should not be unmindful of the oath this state required of him, before he was privileged to have his name entered upon the roll as an attorney." (*Ibid*.) An attorney is admitted as a member of the bar to promote the ends of justice, and that implies 'something more than private gain.' " (*Id*. at p. 923)

Nothing in this record demonstrates that ILG's services in securing $750 for each of its 600 clients and facilitating their participation in *Lofton* were worth the $5.5 million it claimed for itself in attorneys' fees. On this record, the court was correct to deny ILG any part of the $5.5 million and instead direct that it be awarded to the *Lofton* class that included ILG's 600 clients.

*E. The Court Was Not Required to Vacate the Lofton Settlement.*

ILG argues that if its fees "were part of the *Lofton* settlement, then the only available course of action when the court determined that the previously-approved settlement was unacceptable was to reject the settlement and require the parties to re-negotiate it." It supports this argument with citations to cases involving agreements that included a specific amount of attorneys' fees as a term of settlement, (See, *Leeman v. Adams Extract & Spice, LLC* (2015) 236 Cal.App.4th 1367) or where a party sought to deviate from the express terms of settlement. (See, *Karpinski v. Smitty's Bar, Inc.* (2016) 246 Cal.App.4th 456.) Neither is the case here.

This case involves two settlement agreements. One of them for $19 million, the other for $6 million. Both are common fund settlements, both compensate for claims made in *Lofton*, and the attorneys' fees payable in them should have been reviewed and approved by the *Lofton* court. (See, infra. Discussion at part D.) That is the effect and substance of the superior court's ruling.

The *Lofton* settlement provides: "The total amount to pay the timely and valid claims of the Class Members ('Class Members' Distribution Amount'') consists of the $19,000,000.00 Settlement Sum and any interest accrued thereon less the following: (1) attorneys' fees and litigation costs awarded by the Court to Class Counsel; (2) any enhancement payment to the Class Representative awarded by the Court; (3) a reasonable

20

amount to the Claims Administrator approved by the Court to administer the Settlement; and (4) the sum of $60,000 to be paid to the California Labor and Workforce Development Agency as penalties pursuant to California Labor Code Section 2699(i) and (j)." The ILG settlement, on the other hand, is not memorialized in a single written settlement agreement. Rather, the only supporting documentation are the approximately 600 Confidential Releases signed by ILG clients in favor of Wells Fargo. This document made clear that ILG was claiming $5,520,000 as attorneys' fees and that "Wells Fargo has not specified or agreed to any allocation toward attorneys fees. Consequently, the allocation is based solely on an agreement between individual plaintiffs and ILG."

The superior court's ruling simply disallowed this $5,520,000 claim for attorney's fees and instead paid it to the *Lofton* class, including ILG's clients. As we said in *Lofton I*, "The class members were entitled to have ILG's claim for fees in variance with their fee agreement, and in such disproportion to the recovery obtained, independently reviewed by the class action court." (*Lofton I, supra*, 230 Cal.App.4th at p. 1064.) Moreover, as the superior court observed, the class notice stated the settlement fund available for distribution could be affected by the award of court-approved attorney's fees and the number of class members filing claims. The court's decision to deny fees to ILG has the effect of increasing the funds available for distribution to the class. On this record, the ruling did not effect a material change in the terms of the *Lofton* settlement that would require vacatur.

*F. There Was No Violation of the Attorney-Client or Mediation Privileges.*

ILG contends that because the court relied only upon evidence of ILG's behavior from a handful of its clients who offered declarations in support of Maxon and the *Lofton* class, it was "barred from defending itself because it could not, consistent with its ethical obligations to its clients, disclose what it had told its other approximately 595 clients about their individual settlements with Wells Fargo." ILG says in its opening brief in this court that this is because "The Vast Majority Of Its Clients Did Not Waive the Attorney-Client Privilege." The record, however, is silent on whether ILG sought any such waivers or even approached its other 595 clients about the possibility of waiving the

21

privilege so ILG could defend its claim to over $5 million in attorneys' fees. Moreover, ILG made no showing that the declarations provided by its clients were false, misleading or incorrect in any material way, and the evidence produced by ILG shows that all its clients, with the exception of payments to "class representative" plaintiffs, were similarly compensated from its separate settlement.

ILG's argument implies that this case should have been dismissed on the basis that its due process rights to present a defense were violated by its inability to disclose attorney-client privileged information. But to secure such a dismissal ILG was required to show that its clients were "insisting that the information remain confidential." (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 792.) As stated above, there is no such showing here. Nor does this record demonstrate that it was necessary for ILG to disclose privileged information. Had ILG moved for an award of attorneys' fees and demonstrated extensive efforts on its clients' behalf, the specific content of any attorney-client communications would have been irrelevant.

ILG's claim that the trial court invaded the mediation privilege is similarly bereft of merit. The alleged invasion of mediation confidentiality consisted of the trial court's reliance on the representations of class counsel and counsel for Wells Fargo at the preliminary approval hearing in *Lofton* that ILG and Wells Fargo reached a settlement in the 2011 mediation. Nonsense. Counsels' representations to the court, even if inaccurate, did not relay "anything said or any admission made for the purpose of, in the course of, or pursuant to a mediation." (Evid. Code, § 1119, subd. (a).) Moreover, the *Lofton* court was charged with evaluating the sufficiency of the class settlement and "the fact that the settlement was reached during mediation . . . does not eliminate the court's obligation to evaluate the terms of the settlement and to ensure they are fair, adequate and reasonable." (*Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 131-132.) Since ILG's clients were members of the *Lofton* class whose claims were extinguished by the *Lofton* settlement, the court was properly told of their possible separate settlement with Wells Fargo. Indeed, rather than conceal the status of that settlement from the *Lofton* court, we agree with the superior court that it was incumbent upon ILG to set the

22

record straight if there was some misunderstanding of the terms or existence of its separate agreement. The mediation privilege was not invaded by class counsels' representations to the superior court that ILG and Wells Fargo had reached a separate settlement, even if word of the agreement was premature.

> ## G. ILG was Properly Directed to Reimburse the Lofton Class for the Service Awards It Unilaterally Provided to Three of its Clients.

ILG argues the court had no authority to order it to "disgorge" $22,500 it paid to clients Hollander, Peña and Strickler. It argues that there could be no disgorgement because ILG never had the money in its account. It was paid directly to its clients by Wells Fargo through the settlement facilitator. ILG also contests the trial court's conclusion that the payments were improper as either fee splitting or an unapproved service award because the finding is "*based on no evidence whatsoever*."

ILG must be reading a different record than we are. The declaration of ILG attorney Marc Primo states: "In light of the effort Michael Hollander, Paula [Peña] and Laura Strickler had made, it was agreed that they would receive $7500 along with their $750 individual settlement payments. Hollander and Strickler were no longer putative class representatives and the [Peña] action had been mooted by the Lofton class action settlement." The payments were also at the direction of ILG and from money ILG was otherwise claiming as its fee. Primo's declaration filed with the trial court to show ILG's compliance with the temporary restraining order we affirmed in *Lofton I* states: "Although ILG was entitled to receive $5,448,000 for fees and costs, $22,500 of that amount was distributed by [the settlement facilitator] directly to three former ILG clients at ILG's request." Moreover, the declaration of counsel for Wells Fargo makes clear that its settlement with ILG provided that ILG's clients were to release all their claims in return for Wells Fargo's payment of an unallocated and undivided $6 million. The Confidential Release sent by ILG to each of its 600 clients stated: "[w]e propose, and by signing below, you agree to an allocation of $750.00 to each of the approximately 600 individuals including yourself. This will leave the remaining monies, approximately $5,520,000 for ILG."

23

This record amply supports the court's conclusion that the $22,500 paid to three of ILG's former clients was either an unauthorized service award to class representative or improper fee sharing with non-lawyers. The objection that the court could not order disgorgement of this money is without substance. If the record in this case shows one thing, it's this: until the trial court did something about it, ILG had constructive possession of the entire $6 million settlement between its clients and Wells Fargo, and control over its disbursement to the very penny.

*H. ILG Received Due Process.*

ILG contends the proceedings in the trial court deprived it of due process because the court's order directing distribution of the proceeds of the ILG settlement with Wells Fargo for the benefit of the *Lofton* class was *sua sponte* and "ILG would have had an opportunity for a full hearing on the merits." Again, the record demonstrates that ILG's claim mischaracterizes the process and nature of proceedings in the trial court. Following remand of *Lofton I*, in April 2015 the trial court held a case management conference. The order issued following that conference directed the parties to file relevant evidence and motions, including any motions for attorneys' fees, and set a hearing on preliminary injunctive relief for June 24, 2015.

ILG filed multiple opposition briefs, declarations and exhibits for the hearing. But it never moved for an award of attorneys' fees, and never sought to obtain discovery. ILG's attorneys who attended the June 24 hearing declined the court's invitation to speak on their own behalf. Moreover, when counsel for ILG was arguing due process challenges to the court's proceeding, the court engaged counsel in an extended colloquy and invited additional evidence, an offer of proof, and asked ILG to identify its contemplated discovery. When all was said and done, the court asked counsel "[W]hat is it that you think you haven't presented to the Court that you would like to present to the Court?" Counsel answered: "Your Honor, I believe that based on the record that we have, we presented everything that we wanted to present with respect to [distribution of the settlement proceeds] including our argument that the Court doesn't have the jurisdiction to do this at this point, and that it exceeds the court's authority."

24

Finally, ILG makes an argument that the proceeds of settlement could not be distributed in this case, but instead should be considered as a possible item of damages in the legal malpractice case of *Maxon v. ILG*, which remains pending before the San Francisco Superior Court. (See *Lofton I, supra*, 230 Cal.App.4th at p. 1058.) What we said in *Lofton I* about the propriety of the temporary restraining order remains true and controls our consideration of the injunctive relief here.  "We need not consider whether Maxon has an adequate legal remedy in his separate action against ILG because the absent class members, whose interests the court was also seeking to protect with the TRO do not. Likewise, the trial court has a substantial interest in preserving the proceeds of a settlement that arguably should have been allocated and approved within the context of the class action proceedings."  (*Id*. at p. 1067.)

## DISPOSITION

The superior court's order for injunctive relief filed June 16, 2015, is affirmed.  A copy of this opinion shall be sent to the State Bar of California.

 

                                          _____

                                          Siggins, P.J.

We concur:

_____

Pollak, J.

_____

Jenkins, J.

| Trial Court: | San Francisco City and County Superior Court |
|---|---|
| Trial Judge: | Honorable Mary E. Wiss |

Counsel:

Initiative Legal Group, Joseph A. Hearst for Appellant, Initiative Legal Group.

Drescher Law Firm, Robert E. Drescher; Steven A. Soloway for Movants and Appellants, Marsha Kaye and Linda Summers.

Kevin J. McInerney, James F. Clapp for Plaintiff and Respondent, Dawn Lofton.

Chavez & Gertler, Mark A. Chavez, Nance F. Becker for Intervenor and Respondent Terri Maxon.

Littler Mendelson, Mary D. Walsh, Lindbergh Porter, Jr., for Defendant and Respondent Wells Fargo Home Mortgage.